UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, 100 F. Street, NE Washington, D.C. 20549-6030<br><br>Plaintiff,<br><br>v.<br><br>INGERSOLL-RAND COMPANY LIMITED Clarendon House 2 Church Street Hamilton HM 11, Bermuda<br><br>Defendant. | Civil Action No. _____ |

# COMPLAINT

Plaintiff, U.S. Securities and Exchange Commission (the "Commission"), alleges:

## SUMMARY

1.  From approximately 2000 through 2003, Ingersoll-Rand Company Limited ("Ingersoll-Rand") violated the books and records and internal controls provisions of the Foreign Corrupt Practices Act (the "FCPA") [15 U.S.C. §§ 78dd-1, et seq.] when its subsidiaries entered into contracts involving approximately $1,507,845 in kickback payments in connection with sales of industrial equipment to Iraqi government entities under the United Nations Oil for Food Program. On some of these contracts, Ingersoll-Rand, through its subsidiaries, authorized or paid these kickbacks in the form of under-the-table "after sales service fees" ("ASSF"). On other contracts, the ASSF payments were made either by distributors or third parties. Ingersoll-Rand knew or was reckless in not knowing that the kickbacks were paid or agreed to. And it knew that the

ASSF payments were prohibited by the Oil for Food Program, as well as under U.S. and international trade sanctions.

2. Ingersoll-Rand also violated the books and records and internal controls provisions of the FCPA when its Italian subsidiary I-R Italiana paid travel and hotel expenses for eight Iraqi government officials to visit Italy for six nights, a portion of which included a factory tour and training, and the remainder holiday travel. In addition I-R Italiana provided the officials with a total of $8,000 in "pocket money."

3. The Oil for Food Program was intended to provide humanitarian relief to the Iraqi population, then subject to comprehensive international trade sanctions. The Program allowed the Iraqi government to purchase necessary humanitarian goods, but required that all purchases be made through a U.N.-controlled escrow account. The kickbacks paid in connection with Ingersoll-Rand's Oil for Food contracts had the effect of diverting funds out of the escrow account and into an Iraqi slush fund.

4. In accounting for certain of its Oil for Food Program transactions, Ingersoll-Rand failed to accurately record the nature of the ASSF payments as kickbacks to the Iraqi regime. Ingersoll-Rand also failed to devise and maintain a system of internal accounting controls sufficient to detect and prevent the illicit ASSF payments.

5. As a result of the conduct above, Ingersoll-Rand violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## JURISDICTION

6. This Court has jurisdiction over this action under Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. Ingersoll-Rand,

directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

7. Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Ingersoll-Rand does business in this judicial district.

## DEFENDANT

8. Ingersoll-Rand is a Bermuda company with its executive offices in Montvale, New Jersey, and Davidson, North Carolina. Ingersoll-Rand is a global diversified industrial firm that provides industrial equipment and products and services to transport food and perishables, and secure homes and commercial properties. Four Ingersoll-Rand subsidiaries sold goods to Iraq under the Oil for Food Program. Ingersoll-Rand's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78l(b)] and is traded on the New York Stock Exchange under the symbol "IR."

## RELEVANT ENTITIES

9. **ABG Allgemeine Baumaschinen-Gesellschaft mbH** ("ABG") was a wholly-owned German subsidiary of Ingersoll-Rand. During the relevant time, ABG manufactured and sold road construction equipment, including pavers, and compactors.

10. **Ingersoll-Rand Italiana, SpA.** ("I-R Italiana") is a wholly-owned Italian subsidiary of Ingersoll-Rand. I-R Italiana manufactures and sells large air compressors under the brand name Centac for use in oil refineries. Its principal manufacturing facility is in Vignate, Italy.

3

11. **Thermo King Ireland Limited** ("Thermo-King Europe") is a wholly-owned Irish subsidiary of Ingersoll-Rand. Thermo-King Europe manufactures and sells refrigeration equipment for trucks, buses, and rail cars.

12. **Ingersoll-Rand Benelux, N.V.** ("I-R Benelux") is a wholly-owned Belgian subsidiary of Ingersoll-Rand. I-R Benelux manufactures and sells skid steer loaders and other compact construction vehicles.

13. **Ingersoll-Rand World Trade Ltd.** ("IRWT"), based in Fribourg, Switzerland, was during the relevant period a trading subsidiary of Ingersoll-Rand. IRWT handled contract administration for many of Ingersoll-Rand's manufacturing subsidiaries, including transactions involved in the Oil for Food Program. IRWT's responsibilities included obtaining U.N. authorization for Oil for Food contracts and obtaining export control permits.

## FACTS

I   The United Nations Oil for Food Program

14. Following Iraq's invasion of Kuwait in 1991, the United Nations Security Council and the United States imposed comprehensive economic sanctions on Iraq. Over the following years, the sanctions triggered a humanitarian crisis, with severe shortages of food and medical supplies. In response, the U.N. Security Council authorized a relief program under which the Iraqi government would be permitted to sell crude oil and use the proceeds to purchase humanitarian supplies.

15. Under the terms of the Oil for Food Program, the Iraqi government was authorized to sell crude oil to buyers of its choosing. A U.N. committee reviewed the commercial terms of each contract and approved each sale. The proceeds were wired by

the purchaser directly into an escrow account maintained by the U.N. at BNP Paribas in New York. The Iraqi government was not given direct access to the proceeds of its oil sales, but was allowed to use the funds to purchase humanitarian goods, subject to U.N. review and approval. Individual Iraqi ministries could negotiate contracts for approved categories of products. The suppliers submitted their contracts to the U.N. committee for review. Upon approval of each contract, and after verification that the goods had been received in Iraq, the committee authorized payment to the supplier from funds in the escrow account.

16. The Oil for Food Program was intended to maximize the Iraqi government's flexibility in meeting its humanitarian needs, while preventing it from undermining trade sanctions by diverting cash from the transactions. In practice, however, the Iraqi government was able to circumvent the Program's restrictions by demanding massive under-the-table payments from its contract partners. Starting around August 2000, each Iraqi ministry demanded a 10% "after sales service fee" ("ASSF") on all humanitarian goods purchased under the Program. The fee bore no relation to any actual services and was, in reality, an illicit 10% kickback to the Iraqi regime. The ASSF payment was not identified in the official purchase contracts that the suppliers provided for U.N. review and was not made through the U.N.'s authorized payment channels.

17. According to the U.N.'s Independent Inquiry Committee created to investigate corruption in the Program, the Iraqi regime collected just over $1 billion in ASSF payments from suppliers. Payments were typically made in cash by the suppliers holding the Oil for Food contracts. The associated cost of the ASSF payments was passed along to the U.N.-controlled escrow account as the suppliers inflated their contract

prices to cover the illicit payments. The ultimate economic effect of the kickbacks, therefore, was to deprive the U.N.'s humanitarian program of over $1 billion in humanitarian resources that otherwise would have been available to it.

18. Each Iraqi ministry was responsible for collecting ASSF payments on the contracts it administered. In addition, the Ministry of Transportation ensured that no humanitarian supplies were permitted to cross Iraq's border without proof that all required ASSF payments had been paid. Because the payments violated U.N. requirements, the collection effort was handled surreptitiously. As demanded by Iraqi officials, the supplier made its ASSF payment -- either directly or through an Iraqi front company -- in cash at an Iraqi embassy or by depositing the funds at the Iraqi-owned Al-Rashid Bank in Lebanon or the Al-Rafidain Bank in Jordan.

19. Following the U.S. invasion and occupation of Baghdad in 2003, the Coalition Provisional Authority assumed responsibility for ongoing Oil for Food contracts. The Provisional Authority put an end to the ASSF kickback requirement and renegotiated all open contracts to remove the associated 10% markups.

II   **Ingersoll-Rand's Payment of ASSF's under the Program**

20. Ingersoll-Rand engaged in Oil for Food transactions through four of its European subsidiaries: ABG, I-R Italiana, Thermo-King Europe, and I-R Benelux. Ingersoll-Rand subsidiaries entered into twelve contracts in which an ASSF kickback payment was either made or agreed to. In total, Ingersoll-Rand subsidiaries, their distributors, and one contract partner made ASSF payments of approximately $963,148 and authorized additional payments of $544,697.

A. **Contracts Involving ABG**

21. Ingersoll-Rand's German subsidiary ABG entered into a total of six contracts involving ASSF payments. The first two of these were contracts with the Mayoralty of Baghdad for the sale of approximately $3.2 million in road construction equipment for use by the Iraqi Ministry of Housing. In late November 2000, as the agreements were being negotiated, an ABG Sales Manager met with Iraqi officials in Baghdad, where he was given revised contracts prepared by the Iraqi Ministry of Housing. The revisions included 10% price markups to be included in the contracts ABG submitted for U.N. approval. The Iraqi officials also demanded a 10% cash payment. The contract did not disclose the cash payment back to the Iraqi Ministry.

22. On November 27, 2000, shortly after the Baghdad meeting, the Woodcliffe Lakes, New Jersey, office of Ingersoll-Rand's Chairman received an anonymous fax alerting the company to a kickback arrangement:

> "In reference to your A/M contract, we would like to alert you that it is against UN & U.S. regulations, to reimburse in cash, the Iraqi government with 10 percent of the contract amount, which is hidden in the contract's amount.
>
> Although you are reimbursing through your agent, . . . , this does make you totally responsible for this major offense. . . ."

Upon receiving the document, Ingersoll-Rand initiated an investigation into the allegations. ABG's Sales Manager was questioned about the Baghdad Mayoralty transaction and admitted that the Baghdad Mayoralty contracts contained ten percent mark-ups, which would be paid back to the Iraqi Ministry as "working capital," which totaled $292,578.

7

23. After discussing the matter with ABG's Sales Manager and seeking advice from outside counsel, ABG, through the trading company IRWT, attempted to go forward with the Baghdad Mayoralty transactions. They submitted the contracts for U.N. approval with a short statement on a cover letter that each contract "includes 10% working capital to be given as a rebate to [the] Baghdad Mayoralty." After receiving questions from the U.N., ABG later admitted that the 10% amount represented a cash payment to the Iraqi Ministry. The U.N. officials advised that the payments were not allowed under Security Council resolutions and had to be eliminated from the contracts. Ultimately, the Baghdad Mayoralty refused to go forward with the contract without the 10% payment, and the contracts were never concluded.

24. Under these circumstances, senior officials at Ingersoll-Rand's corporate headquarters, ABG, and IRWT, were on notice that Iraqi government officials were demanding cash kickbacks on Oil for Food contracts and that such ASSF payments were prohibited under U.N. Security Council resolutions and, by extension, U.S. and international trade sanctions.

25. Ingersoll-Rand did not withdraw from participation in the Oil for Food Program. Nor did it conduct appropriate due diligence to prevent the payment of ASSF payments under future Oil for Food contracts. Indeed, in the year following termination of the Baghdad Mayoralty transactions, ABG's Sales Manager negotiated four more Oil for Food contracts on ABG's behalf. This latter group of contracts was entered into on an indirect, or distributorship, basis, with knowledge that the goods would be resold into Iraq.

26. The distributors made, or agreed to make, ASSF payments on all four contracts. ABG's Jordanian distributor made a total of $107,754 in ASSF payments on two contracts. ABG's Lebanese distributor made an ASSF payment of $120,305 on one contract and entered into a side agreement to make an additional ASSF payment of $198,000 on another contract. The $198,000 payment was never made because the contract was renegotiated by the Coalition Provisional Authority after the 2003 invasion.

27. Ingersoll-Rand, ABG, and IRWT either knew or were reckless in not knowing that ASSF payments had been paid or offered under each of the four contracts.

B. **Contracts Involving I-R Italiana**

28. Ingersoll-Rand's Italian subsidiary, I-R Italiana, manufactured large air compressors under the CENTAC brand for use in oil refineries. Between November 2000 and May 2002, I-R Italiana entered into four Oil for Food contracts involving a total of $473,302 in ASSF payments. The first three were direct contracts between I-R Italiana and the Iraqi Oil Ministry. The fourth was a third-party contract made through I-R Italiana's Jordanian distributor.

29. The I-R Italiana contracts were negotiated by the company's Middle East Sales Manager. In November 2000 -- at about the same time that Ingersoll-Rand's Chairman received the anonymous fax concerning the Baghdad Mayoralty kickbacks -- the Sales Manager signed the three direct contracts with the Iraqi State Oil Marketing Organization ("SOMO"). During the negotiation, the Sales Manager agreed to pay a 10% ASSF payment on each contract. To conceal the ASSF payments, the Sales Manager and SOMO increased the payment due on each contract by 10% and created a

fictitious line item on I-R Italiana's purchase orders to justify the extra payment to the U.N.

30. The Sales Manager signed at least two side letters on I-R Italiana's behalf committing the company to make the required ASSF payments. In one of the side letters, the Sales Manager stated explicitly that the fictitious purchase order description used to conceal the kickback did not represent an actual performance obligation on I-R Italiana's part. The side letter specified that "the item . . . piping, installation and commissioning, has been added only to pay the client, Baiji Refinery, the amount of [$181,032], and [I-R Italiana] is not obliged to meet this type of requirement."

31. I-R Italiana's Sales Manager arranged for I-R Italiana's Jordanian distributor to make the ASSF payments to SOMO under the three contracts. In order to conceal the nature of the payments, the distributor issued invoices to I-R Italiana for work that it either did not perform or that would already have been covered in the distributor's base commission. The invoices described such services as providing "follow up on all U.N. administrative work," supervising the unloading and installation of equipment, and covering the "cost of any additional insurance."

32. In its accounting books and records, I-R Italiana incorrectly recorded its ASSF payments to its Jordanian distributor as "sales deductions." The company incorrectly recorded its payment on a third contract under the account "other commissions."

33. I-R Italiana's fourth Oil for Food contract was handled in a different manner from the previous three. In or around October 2001, the Iraqi government revoked the requirement that all transactions be negotiated and entered into directly with

manufacturers. As a result, I-R Italiana resumed selling goods into Iraq through its distributors. Thus, for the fourth contract, the goods were sold through I-R Italiana's Jordanian distributor. I-R Italiana sold compressor parts to the distributor, which re-sold them to the Iraqis at a 119% markup. In this instance, it was the distributor, not I-R Italiana, that signed an October 10, 2001, side agreement to make an ASSF payment of $178,692. A June 20, 2001, memorandum agreement between I-R Italiana and the Jordanian distributor explicitly refers to the distributor's obligation to make the ASSF payment under this contract.

### C.   Contract Involving Thermo-King Europe

34.   Ingersoll-Rand's Irish subsidiary Thermo-King Europe authorized an ASSF payment on one contract. On October 19, 2000, the Regional Director for Thermo-King Europe and Thermo-King Europe's Iraq dealer arrived in Baghdad to finalize a contract for the sale of spare parts for refrigerated trucks to the Iraqi government-owned General Automobile & Machinery Trading Company ("GAMCO"). At that meeting, the Regional Director signed a side agreement with GAMCO to make an ASSF payment of $53,919.

35.   The ASSF payment obligation was not reflected in the contract documents submitted to the U.N. The contract, however, failed to receive U.N. approval for reasons unrelated to the ASSF payment.

### D.   Contract Involving I-R Benelux

36.   Ingersoll-Rand's Belgian subsidiary I-R Benelux had a role in one contract involving an ASSF payment of $260,787. On June 27, 2002, I-R Benelux entered into a contract with a Jordanian third party to sell 100 skid steer loaders and spare parts for

11

resale to the Iraqi State Company for Agricultural Supplies. The Jordanian third party resold the equipment into Iraq through the Oil for Food Program, with I-R Benelux's knowledge, at a 70% markup. I-R Benelux shipped the goods into Iraq and obtained all necessary export control licenses.

37.     The third party subsequently confirmed in writing that it had made the ASSF payment when questioned by the U.N. Independent Inquiry Committee.

38.     As noted above, by the time this contract was entered into, officials at Ingersoll-Rand's headquarters were on notice that Iraqi authorities were demanding illicit ASSF payments on all Oil for Food Program contracts. Ingersoll-Rand did not perform appropriate due diligence on the Jordanian third party or on this contract to ensure that no ASSF payments were being made in connection with it.

### E.     I-R Italiana's Payment of Travel and Entertainment Expenses and "Pocket Money" to Iraqi Government Officials

39.     In February 2002 officials at I-R Italiana sponsored a site visit by eight officials from the Iraqi Oil Ministry's Baiji refinery. The Iraqi officials spent two days touring and training at the company's manufacturing facility in Vignate, Italy. According to internal email messages, the Iraqi officials spent two additional days "on holiday" touring Florence at the company's expense. Although the factory tour had a legitimate business purpose, the Florence tour did not. I-R Italiana paid approximately $10,484 on hotels, $1,798 on taxis, and distributed $1,000 in "pocket money" to each of the Iraqi officials.

40.     I-R Italiana's payment of holiday travel expenses and "pocket money" violated Ingersoll-Rand's internal policies regarding payments to foreign government officials. The company's 2002 FCPA Manual permitted payments directly related to

product demonstrations or actual contracts but expressly prohibited any payment for vacations. The company's Travel Guidelines expressly barred any cash payment of "pocket money" or "walking around money."

41. Ingersoll-Rand also failed to account properly for its pocket money payments in its accounting books and records, recording the payments under a general ledger account for "cost of sales deferred."

## III  Ingersoll-Rand's Failure to Maintain Adequate Internal Controls

42. Ingersoll-Rand failed to maintain a system of internal controls sufficient (i) to ensure that the company's transactions under the Oil for Food Program were executed in accordance with management's authorization and (ii) to maintain accountability for the company's assets. As discussed above, Ingersoll-Rand subsidiaries either made or agreed to make numerous illicit payments that contravened the Oil for Food Program, U.S. and international trade sanctions, and its own internal FCPA and anti-bribery policies. In addition, I-R Italiana paid for the travel expenses of Iraqi officials and provided them with "pocket money," in contravention of Ingersoll-Rand's internal FCPA policies.

43. Ingersoll-Rand failed to devise and maintain an effective system of internal controls to prevent or detect these violations of the FCPA, as required by Exchange Act Section 13(b)(2)(B).

## IV  Ingersoll-Rand Fails to Properly Maintain Its Books and Records

44. As described above, Ingersoll-Rand's accounting for its Oil for Food transactions failed properly to record the nature of the ASSF payments. In at least three transactions, the subsidiaries' sale price for goods sold under the Program included ASSF

13

payments in violation of UN regulations and trade sanctions, as well as Ingersoll-Rand's FCPA policies. The company's subsidiaries failed to properly designate those payments, characterizing them instead as "sales deductions" or "other commissions."

45. One of the company's subsidiaries also failed to accurately designate its improper payment of "pocket money" and travel expenses it made to visiting Iraqi government officials by characterizing the payment as "cost of sales deferred," thereby failing accurately to record these payments in its books, records, and accounts.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**[Violations of Section 13(b)(2)(A) of the Exchange Act]**

46. Paragraphs 1 through 45 are realleged and incorporated by reference.

47. As described above, Ingersoll-Rand, through its officers, agents and subsidiaries, failed to keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

48. By reason of the foregoing, Ingersoll-Rand violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

### SECOND CLAIM

**[Violations of Section 13(b)(2)(B) of the Exchange Act]**

49. Paragraphs 1 through 48 are realleged and incorporated by reference.

50. As described above, Ingersoll-Rand failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that payments were: (i) made in accordance with management's general or specific authorization; and (ii) recorded as necessary to maintain accountability for its assets.

51. By reason of the foregoing, Ingersoll-Rand violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

A. Permanently restraining and enjoining Ingersoll-Rand from violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and (B)];

B. Ordering Ingersoll-Rand to disgorge ill-gotten gains, with prejudgment interest, wrongfully obtained as a result of its illegal conduct;

C. Ordering Ingersoll-Rand to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

D. Granting such further relief as the Court may deem just and appropriate.

Dated: Oct. 31, 2007

Respectfully submitted,

Cheryl J. Scarboro (D.C. Bar No. 422179)
Tracy L. Price
Robert I. Dodge

Attorneys for Plaintiff,
U.S. Securities and Exchange Commission
100 F Street, NE
Mail Stop 6030 SPII
Washington, DC 20549-6030
(202) 551-4403 (Scarboro)

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-6030

## DEFENDANTS

Ingersoll-Rand Company Limited
Clarendon House, 2 Church Street
Hamilton HM 11, Bermuda

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  N/A
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Cheryl J. Scarboro, Tracy L. Price, Robert I. Dodge
U.S. Securities & Exchange Commission
100 F Street, NE
Washington, DC 20549-6030
(202) 551-4403 (Scarboro)

ATTORNEYS (IF KNOWN)

Randall Turk, Samuel Waldon, Bridget Moore
Baker Botts LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2400
(202) 639-7782 (Waldon)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ⦿ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ⦿ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ⦿ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ○ A. Antitrust
☐ 410 Antitrust

### ○ B. Personal Injury/Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review
☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff))
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ⦿ E. General Civil (Other)   OR   ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
- ● 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

See Attachment A

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** _____   Check YES only if demanded in complaint   **JURY DEMAND:** YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

**DATE** 10/31/07   **SIGNATURE OF ATTORNEY OF RECORD** [signature]

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

Civil Cover Sheet Attachment A

**U.S. Securities and Exchange Commission v. Ingersoll-Rand Company Limited**

**VI. Cause of Action**

This case is filed under the following civil statutes: 15 U.S.C. § 78u(d) - (e) (2006), and 15 U.S.C. § 78aa (2006).

This action arises from the defendant's violations of the following provisions of the Federal Securities laws: Sections 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 [15 U.S.C. § 78m(b)(2)(A) and 15 U.S.C. § 78m(b)(2)(B)